IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 06–cv–00021–EWN

RALPH E. SALYARDS,

      Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner
of Social Security,

      Defendant.

_____

**ORDER AND MEMORANDUM OF DECISION**
_____

      This is a social security benefits appeal under 42 U.S.C. § 405(g) (2006).  Plaintiff Ralph

E. Salyards challenges the final decision of the Commissioner of Social Security (the

"Commissioner"), denying his application for Social Security Disability Insurance benefits.

Jurisdiction is based on 42 U.S.C. § 405(g) (2006).

**FACTS**

*1.*    ***Medical Evidence***

      Plaintiff was born on February 9, 1946 and was fifty-six years old at the onset of his

alleged disability.  (Admin. R. at 62 [filed Mar. 10, 2006] [hereinafter "Admin. R."].)  Plaintiff has

a high school education.  (*Id.* at 78.)  He has worked in the vocationally relevant past as a: (1)

laborer; (2) truck driver; (3) heavy equipment operator; and (4) parts, repair, and installation

person.  (*Id.* at 89–95.)  Plaintiff alleges an inability to work beginning June 10, 2002 due to: (1)

pain in his lower back and right leg; and (2) rheumatoid arthritis in his neck and back.  (*Id.* at 72.)

> ### a.    *Neck and Back Pain*[1]

Plaintiff has a longstanding history of rheumatoid arthritis.  (*Id.* at 143, 145.)  He also has

a history of back problems dating back to at least June 21, 2001, when a magnetic resonance

imaging ("MRI") of his back showed a severe lumbar spondylosis.[2]  (*Id.* at 203–08.)  On July 23,

2001, Plaintiff underwent vertebral decompression surgery.  (*Id.* at 268.)

> ### i.    *2002*

On June 11, 2002, Plaintiff was injured in a work-related motor vehicle accident.  (*Id.* at

143.)  Plaintiff was examined and treated at Memorial Hospital and was administered a narcotic

for neck and chest pain.  (*Id.* at 142–58.)  His physical and neurological examinations were

otherwise normal.  (*Id.*)  Plaintiff was discharged that same day with a narcotic prescription for his

pain.  (*Id.* at 143.)  In June 2002, Dennis Jelden, M.D. who was acting as one of Plaintiff's

treating physicians by October 2000, refilled Plaintiff's narcotic prescription and prescribed

Plaintiff muscle relaxants due to pain from the motor vehicle accident.  (*Id.* at 179–80, 182.)  On

July 1, 2002, Dr. Jelden restricted Plaintiff to no "prolonged sitting or standing, no lifting more

than [ten pounds], and no bending or reaching above his head."  (*Id.* at 177.)  On July 10, 2002,

---

[1]It appears from the record that the effects of Plaintiff's motor vehicle accident on his neck and back were difficult to distinguish from the effects of his underlying rheumatoid arthritis; thus, I consider both conditions together.  (*See* Admin. R. at 175, 176, 170.)

[2]Lumbar spondylosis is a degenerative disease of the lumbar vertebrae.  3–L ATTORNEYS' DICTIONARY OF MEDICINE 3340 (Matthew Bender & Co. 2005).

Dr. Jelden noted that Plaintiff : (1) "is still having trouble sitting for very long" and that "[a]fter about half an hour in the car he still has to get out and stretch;" and (2) "certainly does have bad rheumatoid arthritis and severe degenerative changes at least in his neck." (*Id.*) Dr. Jelden also refilled both Plaintiff's narcotic and muscle relaxant prescriptions. (*Id.*)

On July 11, 2002, Plaintiff was seen at the Denver Veterans Health Administration Hospital ("Denver VA") for his rheumatoid arthritis. (*Id.* at 254–55.) He reported new onset neck pain as well as tingling in his hand when he turned his neck too far, but minimal morning stiffness. (*Id.* at 255.) Physical exam showed a tender spine and good strength bilaterally. (*Id.* at 256.) A spinal MRI from that day revealed narrowing of the cervical canal, mild vertebral wedging, moderate degenerative change in the lumbar spine, prominent density, and mild scoliosis.[3] (*Id.* at 197–99.)

On July 22, 2002, Dr. Jelden restricted Plaintiff from work for two weeks and prescribed him physical therapy, which Plaintiff attended for treatment of his cervical spine from July through September of 2002. (*Id.* at 159–68, 176.) During physical therapy, Plaintiff reported on several occasions that his neck and back pain was decreasing, particularly since being on pain medication. (*Id.* at 162, 165–67.) On July 25, 2002, Plaintiff's physical therapist noted, "[Plaintiff] rates his pain now and at best at [two out of ten]. (*Id.* at 166.) Worst immediately following the accident was [ten out of ten]." (*Id.*) On September 16, 2002, his physical therapist discharged Plaintiff upon determining he had achieved maximum benefits from physical therapy. (*Id.* at 159.)

---

[3]Scoliosis is "[a]n abnormal side-to-side curvature of the spine." 2–S ATTORNEYS' DICTIONARY OF MEDICINE 1440.

From July through November of 2002, the medical record shows that Plaintiff continued to complain of neck and back pain to Dr. Jelden, as well as difficulties standing or sitting for long periods of time. (*See id.* at 170–75.) On July 29, 2002, Dr. Jelden noted that "[o]bjectively, there [was] nothing obviously abnormal" with Plaintiff's neck and back. (*Id.* at 175.) On August, 29, 2002, Plaintiff reported that "[h]is pain [was] much improved," but still worse than before the accident. (*Id.* at 172.) On September 10, 2002, Dr. Jelden reported that Plaintiff was able to return to "modified work," but noted Plaintiff claimed he could not sit for the long periods of time required by his job as a truck driver. (*Id.* at 171.) Dr. Jelden further noted that Plaintiff "moves around reasonably well in the room. He prefers not to sit down. He has limited forward flexion. Reasonable movement of his neck with some limitation. He has no strength deficit in arms or legs. No significant cervical or lumbar spasms today." (*Id.*)

By August 12, 2002, Plaintiff began seeing Darrel Fenton, D.O. for his neck and back problems. (*Id.* at 296.) Plaintiff complained of: (1) pain in the lower back that was similar to his pre-injury level; (2) pain in the neck that did not exist prior to his accident; and (3) lightheadedness with certain movements. (*Id.*) On September 9, 2002, Plaintiff complained of lower back discomfort, including pain in his hip, thigh, and calf when walking, as well as lightheadedness with certain movements. (*Id.* at 295.) Physical exam on October 14, 2002 showed Plaintiff had a "decreased range of motion of the cervical spine," increased forward curvature of the spine, no percussion pain over the lumbar area, and tenderness on the left side of his back. (*Id.*) Dr. Fenton diagnosed Plaintiff with persistent low back discomfort, cervical degenerative disc disease, cervical vertigo, and scoliosis. (*Id.*)

An August 2002 spinal MRI at the Denver VA was read as "essentially normal," showing disc space narrowing, scarring from previous back surgery likely effacing a vertebral root, a compression fracture, some signs of canal compromise, and no disc herniation. (*Id.* at 195–96, 250–51.) On August 19, 2002, an electrophysiological[4] exam revealed some abnormalities, but no evidence of carpal tunnel syndrome, radiculopathy,[5] or nerve abnormality. (*Id.* at 254.) Denver VA progress notes show that for the remainder of 2002, Plaintiff continued to complain of neck, back, and radiating leg pain, as well as lightheadedness with certain movements. (*Id.* at 251 (Plaintiff complained of "persistent pain in low back related to repetitive bending with [his] occupation," as well as "radiating pain from low back down right leg to calf especially with ambulation," worsened "pain with prolonged sitting," and "some lightheadedness with certain movements," 219, 226, 228, 250.)

### ii.    *2003*

On January 7, 2003, Plaintiff presented to Dr. Fenton with complaints of back pain, stating that before the accident "he did not really have any problems with his back, discomfort or issues with his prior [back surgery]." (*Id.* at 293.)  Plaintiff reported back tenderness, pain with forward flexing—which was required by his job—difficulty getting up and moving after extended periods of sitting, and pain in his leg after walking a couple of blocks. (*Id.*)  Dr. Fenton gave Plaintiff a

---

[4]Electrophysiology is "[t]he science which deals with the reaction of the body to electric influences."  2–E ATTORNEYS' DICTIONARY OF MEDICINE 1166.

[5]Radiculopathy is "[a]ny disease or abnormality of a . . . spinal nerve root from the point where it merges with the spinal cord (or brain stem) to the point where it joins it companion root (a motor or a sensory) to form a spinal nerve." 5–R ATTORNEYS' DICTIONARY OF MEDICINE 218.

nine percent whole-person impairment rating for lumbar spine impairments.  (*Id.*)  Physical exam showed that Plaintiff walked satisfactorily, had "full range of motion of cervical spine," "[n]o limitations," "[n]o pain or discomfort," "no cervical compression or distraction," satisfactory strength in upper and lower extremities, no radicular or spinal pain, and no spasms.  (*Id.* at 289.)  Dr. Fenton stated, "I don't see anything of the limitations of the patient's arthritis [or] prior issues."  (*Id.*)  Further, Dr. Fenton opined that no factors would preclude Plaintiff from trying to return to work, "either part time or otherwise," and recommended a functional capacity evaluation to determine Plaintiff's occupational limitation.  (*Id.*)

In February of 2003, Plaintiff was seen at the Denver VA for complaints of "[a]chy back pain all of the time" with "minimal relief with aspirin."  (*Id.* at 352)  Plaintiff was diagnosed with chronic rheumatoid arthritis and degenerative disc disease of the back from traumatic injury resulting in chronic pain.  (*Id.* at 354.)  He was noted as "[d]oing well on [his] current regimen." (*Id.*)  On April 17, 2003, Plaintiff again reported his arthritis was "doing well with the current regime" and that he was not experiencing "joint stiffness, swelling or pain."  (*Id.* at 327.)

In April 2003, state agency physician Alan Ketelhohn, M.D., determined that Plaintiff, despite his impairments, retained the residual functional capacity ("RFC") to perform the exertional requirements of light work with no more than frequent handling, balancing, stooping, kneeling, crouching, and crawling, and no more than occasional climbing.  (*Id.* at 134–41.)

On April 21, 2003, Plaintiff began seeing William Holland, M.D. at Greeley Walton, a Veterans' Community Based Outpatient Clinic ("Greeley COBC") for his primary care.  (*Id.* at 409.)  At this initial visit, he stated he was experiencing no pain.  (*Id.* at 408.)  Physical exam

revealed no pain down his spine, full range of motion in his extremities, full muscle strength in upper and lower extremities, and a steady gait. (*Id.* at 411.)  On May 22, 2003, Plaintiff reported that after moving furniture, he experienced severe back pain that radiated down his leg, numbness in his thighs, and pain in his left testicle. (*Id.* at 412.)

On May 23, 2003, Plaintiff was treated at the Denver VA emergency room for his back and leg pain. (*Id.* at 320–21.)  He complained of numbness and tingling in both legs and prevalent pain in his left leg and hip, as well as his low back. (*Id.* at 321.)  A spinal MRI showed a compression fracture, degenerative disc disease, and demineralization. (*Id.* at 304.)  Plaintiff was discharged in "good" condition and was found to have "no obvious injury or deformity," a normal gait, positive straight leg lift, and the ability to toe walk, heel walk, and squat. (*Id.* at 319.)  On May 31, 2003, Plaintiff's physical revealed pain in palpitation down his spine and over his lower back muscles, as well as swelling in his lower back. (*Id.* at 416.)  Plaintiff also reported pain in his left hip. (*Id.*)

By May 28, 2003, Plaintiff reported to a nurse practitioner at the Denver VA that his back was "somewhat better but he still [could not] walk in an upright position." (*Id.* at 413.)  On June 9, 2003, Plaintiff presented with severe pain in his back and left testicle. (*Id.* at 421.)  He stated he "[could not] walk more than [fifty] to [one hundred] feet without having to rest and sit down" and that, when walking, "pain radiates down to his knee and then it seems to come back up the spine going to his left groin." (*Id.*)  The nurse practitioner observed that Plaintiff was "constantly moving" due to pain when sitting in the chair. (*Id.*)  Further, Plaintiff had pain to palpitation of his spine. (*Id.*)  He had negative straight-leg raises, and pain upon internal rotation of the left hip.

(*Id.*)  Plaintiff was prescribed narcotics and referred to an orthopedist.  (*Id.* at 422.)  On June 27,

2003, Plaintiff was assessed as having chronic low back pain, moving stiffly, and guarding his

back.  (*Id.* at 572.)

On July 15, 2003, Dr. Holland noted that Plaintiff "still has some low back pain"

associated with "lumbar back surgery in July 2001."  (*Id.* at 494.)  On July 28, 2003, Stacy Roth,

a physical therapist at Greeley COBC, fitted Plaintiff for a back brace and educated him on back

exercises to help with his back pain.  (*Id.* at 493.)  Plaintiff stated that his pain was decreased by

laying flat, but that he was always in some degree of pain.  (*Id.* at 490.)  Further, "if he does any

amount of bending and lifting through the course of the day it gets to the point where he is unable

to stand up straight," resulting in a pain increase to a level of eight out of ten.  (*Id.*)  He rated his

pain that day as level five out of ten.  (*Id.*)  Plaintiff stated he sometimes experienced back pain

that radiated down his right leg and caused cramping.  (*Id.*)  Moreover, Plaintiff reported his pain

was worsened by long periods of sitting, and that following his accident, he had to stop driving

and get out of his vehicle to walk every forty-five minutes.   (*Id.*)  Plaintiff "admit[ted] none of his

vehicles [had] lumbar support."  (*Id.*)  Physical exam showed that Plaintiff's range of motion in

the lumbar spine was "significantly limited," and that his straight leg raises were negative, but

produced "significant hamstring pain."  (*Id.* at 490–91.)

On July 24, 2003, Plaintiff was seen at the Veterans Health Administration Eastern

Colorado Health Care System's ("ECHCS") Rheumatology Arthritis Clinic by Michael Reed,

M.D.  (*Id.* at 482.)  Progress notes show that Plaintiff's arthritis "[s]ymptoms [were] well

controlled for [the] last [eighteen] months with [medicine]," and that he "[had] occasional

morning stiffness for [less than twenty] minutes with colder weather." (*Id.*)  Plaintiff denied neck

pain. (*Id.*)  In September 2003, an MRI of Plaintiff's lumbar spine was compared to a previous

study dated August 2002; the compression deformity had matured, with progressive fibrosis

and/or bone maturation; the degree of loss of height increased; and, otherwise, the MRI findings

were essentially unchanged. (*Id.* at 563.)

On December 3, 2003, Plaintiff reported to Jens-Peter Witt, M.D., a neurosurgeon, that

the pain radiating down his leg had gotten worse over the year. (*Id.* at 442.)  Dr. Witt read a

September 2003 MRI of Plaintiff's spine to show disc compression, but not disc herniation or

canal compromise. (*Id.*)  Further, he determined that Plaintiff had signs of chronic narrowing of

the nerve openings around the spinal cord or nerve roots because "he can only stand or sit in a

certain position for minutes at a time." (*Id.*)  Dr. Witt discussed possible surgical treatment with

Plaintiff. (*Id.*)

On December 18, 2003, Plaintiff was seen at ECHCS for complaints of lower back pain

and stiffness in the morning that lasted thirty to forty minutes. (*Id.*)  Physical exam showed

Plaintiff had a normal gait, no trigger points, normal joints in all extremities, full motor strength

and intact sensation throughout, and intact deep tendon reflexes. (*Id.* at 473.)  Plaintiff underwent

a lumbar MRI on December 23, 2003. (*Id.* at 445–47.)  It showed disc desiccation, bulging, and

compression, as well as epidural scarring effacing a nerve. (*Id.*)  Plaintiff's disc compression had

"matured," but otherwise the "MRI findings remain essentially unchanged" since August of 2002.

(*Id.*)

### iii.    2004

On January 12, 2004, Plaintiff was seen at Greeley COBC for a routine appointment.   (*Id.* at 485.)  Progress notes show that a neurosurgeon advised back surgery and restricted Plaintiff to lifting under thirty pounds.  (*Id.* at 485–86.)  On March 1 and April 20 of 2004, Plaintiff sought an evaluation of his occupational capabilities from Dr. Jelden, who declined to provide such an evaluation, because he viewed himself "technically" unqualified to make such evaluations.  (*Id.* at 580.)  Still, Dr. Jelden stated on March 1, 2004:

> [Plaintiff] basically is having lots of troubles with his back.  He has severe rheumatoid arthritis . . . .  He is not able to sit for long periods of time.  He can drive locally, as long as he doesn't sit for more than an hour or two.  Unfortunately, that significantly impairs his ability to earn a living.  He has some limited range of motion problems of his back but nothing that would impair his ability to drive a vehicle.

(*Id.*)  On April 20, 2004, Dr. Jelden stated Plaintiff "continues to have a lot of back and leg pain.  He is only sleeping a couple of hours at a time.  I have no doubt that he has significant discomfort and is not able to do normal type of work.  I guess I just need someone who does evaluations like this regularly to determine what his true limitations are."  (*Id.*)

On July 22, 2004, Plaintiff saw Dr. Holland for "assistance with Social Security Disability."  (*Id.* at 555.)  Dr. Holland noted that Plaintiff had been under his care for one year, and that "[t]here [was] no evidence of malingering in this patient."  (*Id.*)  Dr. Holland reported that Plaintiff "was able to ambulate . . . without assistance but with mildly stooped posture," and that Plaintiff "was using no brace or support devices."  (*Id.* at 557.)  The doctor noted pain when Plaintiff performed right and left straight-leg raises, full strength in lower extremities, increased

muscle tone in mid to lower back muscles, extreme tenderness to palpation of the lower back, no

midline tenderness, and flexion "limited by severe pain rated at [nine out of ten] with some spasms

in back.  Due to the severity of the pain with single movements, any attempts at repetitive bending

at the waist [were] not possible."  (*Id.*)  Dr. Holland diagnosed Plaintiff with lumbar spinal

stenosis,[6] as well as "severe limitation to range of motion in the back with inability to perform

repetitive movements."  (*Id.* at 558.)  Further, Dr. Holland determined that "[p]rolonged static

position" were "not possible due to [Plaintiff's] constant pain, escalated by stationary positions."

(*Id.*)  The doctor concluded that "the clinical history of increasing pain with prolonged standing or

walking is consistent with the findings on MRI of stenosis."  (*Id.*)

     Dr. Holland reviewed Plaintiff's history of back troubles, and then described Plaintiff's

complaints since the accident as follows: (1) center of back pain in "lower lumbar area across the

back radiating along . . . the [right] hip and down the [right] leg to the foot," averaging "[four out

of ten] constantly with pain escalating to [nine out of ten] once or twice weekly, lasting [four to

five] hours at a time;" (2) "midline pain [in the] lower thoracic/upper lumbar area occurring

intermittently, describe[d] as knot in back size of tennis ball[, that] may occur [two to three] times

weekly, lasting [a] few hours;" (3) back stiffness; (4) inability to "sit for more than [forty-five]

minutes without getting up and moving around, or to stand in one place for more than [fifteen]

minutes without having to move;" (5) inability to stand up after squatting, as well as after bending

or twisting in the wrong way; (6) pain "[f]lareups . . . caused by prolonged sitting, standing, or

---

[6]Stenosis is "[a] narrowing of the spinal canal . . . usually as a result of . . . degenerative changes . . . ."  5–S ATTORNEYS' DICTIONARY OF MEDICINE 5209.

twisting wrong when bending or leaning over;" and (7) pain alleviated by rest and pain medications. (*Id.* at 555–58.) Dr. Holland noted that surgery was not guaranteed to improve Plaintiff's pain. (*Id.* at 558.)

Regarding Plaintiff's occupation, Dr. Holland found that Plaintiff: (1) did not have symptoms that interfere with attention or concentration necessary to perform simple work tasks; (2) could sit at most forty-five minutes before having to get up and move around; (3) could sit one hour and stand or walk one to two hours in an eight-hour day; (4) must walk around for twenty minutes every twenty minutes; (5) would occasionally need to use a cane; (6) could lift at most twenty pounds rarely and ten pounds occasionally; (7) could not twist, stoop, crouch, or squat and could rarely climb ladders or stairs; and (8) could reach out but could not hold more than three pounds due to his rheumatoid arthritis. (*Id.* at 554.) Finally, Dr. Holland found Plaintiff had the following spinal disorders meeting established listings in Appendix 1, Subpart P, Regulations No. 4, section 1.00: (1) nerve root compression, section 1.04(A) (2); spinal arachnoiditis,[7] section 1.04(B); and (3) lumbar spinal stenosis, section 1.04(C). (*Id.* at 605.)

In September 2004, Louis Phillips, a vocational expert ("VE") hired by Plaintiff, stated that based on his review of Plaintiff's medical record, Plaintiff was disabled as of June 11, 2002. (*Id.* at 113.)

---

[7]Spinal arachnoiditis is an "inflammatory condition[] compressing the spinal cord."  3–I ATTORNEYS' DICTIONARY OF MEDICINE 3664.

b.     *Hand and Wrist Problems*

The medical record reveals that Plaintiff frequently complained of pain, swelling, and decreased strength in his hands due to rheumatoid arthritis.  On July 29, 2002, Dr. Jelden noted that Plaintiff "does have some limited grip strength" as well as "significant rheumatoid changes to his hands."  (*Id.* at 175.)  On September 5, 2002, Plaintiff denied swelling in his hands.  (*Id.* at 251.)  On September 18, 2002, Plaintiff was seen at the Denver VA and complained of "bilateral hand tingling, [and] decreased grip strength."  (*Id.* at 248.)  On October 14, 2002, Dr. Fenton noted that "[Plaintiff did] have decreased grip, equally so bilaterally."  (*Id.* at 295.)  On November 4, 2002, Plaintiff reported subjective loss of strength to Dr. Jelden.  (*Id.* at 170.)

In February of 2003, Plaintiff presented to the Denver VA rheumatology clinic with bilateral wrist soreness.  (*Id.* at 352.)  An April 17, 2003 exam revealed "cool synovial[8] thickening [in] bilateral writs with piano key deformities bilaterally, [and] good [range of motion in] bilateral hands."  (*Id.* at 326.)  On April 21, 2003, Plaintiff was seen at the Greeley CBOC, where progress notes show that the joints of his hands were "swollen," he had bony knobs on his wrists "that seem[ed] to be starting to disfigure [his] hand some[,] and his joints [were] slightly enlarged." (*Id.* at 411.)  On July 24, 2003, while seen at ECHCS, Plaintiff denied "hand redness [and] increased swelling."  (*Id.* at 482.)  On December 18, 2003, Plaintiff reported that his pain level in his wrist was four out of ten that day and was usually two out of ten.  (*Id.* at 471.)  Further, he stated his "[h]and pains interfere w[ith] exercises, but not daily activities."  (*Id.*)

---

[8]Synovial refers to "the 'lining' of the joint."  1–A ATTORNEYS' DICTIONARY OF MEDICINE 10965.

On March 1, 2004, Dr. Jelden noted that Plaintiff "ha[d] deformities of the hands but this [did] not impair his ability to grasp the steering wheel with force and drive safely." (*Id.* at 580.) On May 20, 2004, progress notes from ECHCS show Plaintiff experienced a rheumatoid arthritis flare-up with increased pain, weakness, stiffness, and swelling of his wrists and hands. (*Id.* at 585.) It was noted that "[p]rior to this flare he had been well controlled." (*Id.*)

### c. Foot Problems

Plaintiff was seen at the Denver VA for podiatry problems stemming from his rheumatoid arthritis. (*Id.* at 246.) A September MRI revealed a narrowing of Plaintiff's metatarsal joints. (*Id.* at 194.) On September 23, 2002, he reported feeling as though a marble was under his foot, a feeling which was aggravated by walking. (*Id.* at 246.) In October of 2002, Plaintiff began complaining of pain in his third metatarsal head on his left foot, and at the end of that month, he underwent surgery for removal of the second through fifth metatarsal heads on his left foot. (*Id.* at 232–42.) At his post-operative visits, Plaintiff was ambulating with crutches, and claimed moderate pain that was well-controlled with narcotics. (*Id.* at 228, 230.)

Plaintiff was seen at the VA rhuematology clinic on November 11, 2002 for increased swelling in his hands and wrists because he had stopped taking his arthritis medicine so as not to inhibit healing from his foot surgery. (*Id.* at 226.) By November 26, 2002, Plaintiff reported that he no longer required narcotics to control his pain from his foot surgery. (*Id.* at 221.) By December 20, 2002, Plaintiff stated he was able to wear normal shoe gear without much pain. (*Id.* at 217.) He chose to undergo surgery on his second through fifth metatarsal heads of his right foot on March 17, 2003. (*Id.* at 337.) Plaintiff experienced some post-operative

complications requiring antibiotics, but said his pain was controlled with pain medication.  (*Id.* at 329.)  By April 9, 2003, Plaintiff stated he was able to walk on his foot but reported a new bony growth in his right foot that was causing him pain.  (*Id.* at 581, 585.)

**2.      *Procedural History***

On January 15, 2003, Plaintiff filed an application for disability insurance benefits.  (*Id.* at 62–65.)  On May 15, 2003, the Social Security Administration denied Plaintiff's application.  (*Id.* at 37.)  On July 10, 2003, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 35.)  On November 1, 2004, the ALJ held a hearing, at which Plaintiff and a VE testified.  (*Id.* at 623–55.)

Plaintiff testified that he could not work because he experienced daily pain in his lower back, right leg, neck, and shoulders.  (*Id.* at 631–37.)  Further, he stated he could: (1) walk one and a half blocks before needing to rest; (2) stand in one position for ten to fifteen minutes before needing to move around; (3) sit for thirty-five minutes before needing to stand up; (4) and lift twenty pounds occasionally.  (*Id.* at 631–32.)  Plaintiff claimed he became fatigued when he had to stand for a length of time, and he could not bend, crouch, lift objects with his arms straight out, or climb more than one to two stairs.  (*Id.* at 632.)  Further, Plaintiff stated he had no memory or concentration problems.  (*Id.*)

Plaintiff testified that his daily activities consisted of the following: (1) watching movies; (2) watching his grandchildren; (3) cooking TV dinners; (4) washing a small number of dishes; (5) going downtown to visit with friends; and (6) driving fifty to sixty miles per week.  (*Id.* at

633–34.)  Plaintiff stated he did not do his own laundry, shop without assistance, vacuum, or

cook complex meals.  (*Id.*)

Plaintiff testified to holding a series of part time jobs during his period of alleged disability.

(*Id.*  634–36.)  His job duties involved checking the oil and tire pressure of vehicles and helping to

set up survey equipment.  (*Id.*)  Plaintiff claimed all of his jobs required lifting less than ten

pounds.  (*Id.*)  Further, Plaintiff testified that at his present job he only had to lift three to four

pounds, and he would not be penalized if his pain kept him from coming into work on any given

day.  (*Id.* at 636.)

Deborah Christensen testified as a VE at the hearing regarding her review of the

vocational exhibits in Plaintiff's file.  (*Id.* at 648–51.)  The VE testified that Plaintiff's past work

as a parts clerk for a pump company, though actually performed at medium exertional level by

Plaintiff, was customarily performed at light.  (*Id.* at 649.)  Additionally, the VE opined on a

hypothetical question posed by the ALJ, in which the VE was to assume an individual of

Plaintiff's age, education and skill level, who could: (1) lift twenty pounds occasionally; (2) lift ten

pounds frequently; (3) stand and walk for six hours; (4) sit for six hours; (5) occasionally climb

and stoop; and (6) frequently handle bilaterally.  (*Id.*)  Further, this person would need to stand

and stretch after one hour.  (*Id.*)  The VE opined that such an individual would be capable of

performing Plaintiff's past work as a parts clerk as customarily performed, but not as actually

performed by Plaintiff.  (*Id.* at 649–51.)

On January 20, 2005, the ALJ issued a decision reflecting her finding that Plaintiff was not

disabled within the meaning of the Social Security Act because Plaintiff retained the RFC to

perform his past relevant work as a parts clerk as that position is generally performed in the national economy. (*Id.* at 13–20.) In reaching her conclusion, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since June 10, 2002. (*Id.* at 14.) The ALJ next determined that Plaintiff had the following medically determinable severe impairments: (1) rheumatoid arthritis; (2) status post bilateral foot surgery; and (3) degenerative disc disease of the cervical and thoracic spine. (*Id.*) Despite their severity, the ALJ determined that the impairments were not sufficiently severe to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations Number 4. (*Id.*) Additionally, the ALJ found "the alleged severity of [Plaintiff's] pain and limitations unpersuasive." (*Id.* at 18.)

Based on the evidence presented, the ALJ concluded that Plaintiff had the RFC to "stand, walk and sit for a total of six hours each in an eight-hour day, must stand and stretch after sitting for one hour, lift/carry [twenty] pounds occasionally and [ten] pounds frequently, push/pull [twenty] pounds occasionally and [ten] pounds frequently, occasionally climb and stoop, and no more than frequent handling." (*Id.* at 19.) In accord with this RFC, the ALJ determined that Plaintiff could perform his past relevant work as a parts clerk, and therefore was not disabled. (*Id.*)

On November 7, 2005, the Appeals Council affirmed the ALJ's decision, making it the final administrative decision for the purposes of judicial review. (*Id.* at 5–7.) On January 6, 2006, Plaintiff filed a complaint in this court challenging the Commissioner's denial of disability benefits. (Compl. [filed Jan. 6, 2006].) On June 29, 2006, Plaintiff filed his opening brief. (Pl.'s Opening Br. [filed June 29, 2006] [hereinafter "Pl.'s Br."].) On August 31, 2006, the Commissioner filed a

response.  (Def.'s Resp. [filed June 29, 2006] [hereinafter Def.'s Resp.].)  Plaintiff did not file a

reply brief.

## ANALYSIS

### 1.    *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of

the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3) (2006)

(incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant

part:

> The findings of the Commissioner of Social Security as to any fact, if supported by
> substantial evidence, shall be conclusive, and where a claim has been denied by the
> Commissioner of Social Security or a decision is rendered under subsection (b) of
> this section which is adverse to an individual who was a party to the hearing before
> the Commissioner of Social Security, because of failure of the claimant or such
> individual to submit proof in conformity with any regulation prescribed under
> subsection (a) of this section, the court shall review only the question of
> conformity with such regulations and the validity of such regulations.

*Id.* § 405(g) (2006).  Thus, this court's review is limited to determining whether the record as a

whole contains substantial evidence supporting the Commissioner's decision.  *See id.*; *Hamilton v.*

*Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).  The court must

uphold the Commissioner's decision if it is supported by substantial evidence.  *See Dollar v.*

*Bowen*, 821 F.2d 530, 532 (10th Cir. 1987).  This court cannot re-weigh the evidence nor

substitute its judgment for that of the ALJ.  *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir.

1987).  That does not mean, however, that my review is merely cursory.  To find that the ALJ's

decision is supported by substantial evidence, the record must include sufficient relevant evidence

that a reasonable person might deem adequate to support the ultimate conclusion. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

**2.      *Evaluation of Disability***

To qualify for disability insurance benefits under the Social Security Act, a claimant must meet the insured status requirements, be less than sixty-five years of age, and be under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In proving his disability, a claimant must make a *prima facie* showing that he is unable to return to prior work he has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the Commissioner must demonstrate that the claimant can do other work activities and that the national economy provides a significant number of jobs which the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability insurance benefits. *See* 20 C.F.R. § 404.1520 (2006); *Bowen v. Yuckert*,

482 U.S. 137, 140–42 (1987) (describing five-step analysis).  A claimant may be declared disabled

or not disabled at any step, and, upon such a determination, the subsequent steps may be

disregarded.  *See* 20 C.F.R. § 404.1520(a) (2006); *Williams v. Bowen*, 844 F.2d 748, 750 (10th

Cir. 1988).  First, the claimant must demonstrate that he is not currently involved in any

substantial gainful activity.  20 C.F.R. § 404.1520(b) (2006).  Second, the claimant must show a

medically severe impairment (or combination of impairments) which limits his physical or mental

ability to do basic work activities.  *Id.* § 404.1520(c).  At the third step, if the impairment matches

or is equivalent to established listings, then the claimant is judged conclusively disabled.  *Id.* §

404.1520(d).  If the claimant's impairments are not equivalent to the listings, the analysis

proceeds to the fourth step.  At this stage, the claimant must show that the impairment prevents

him from performing work he has performed in the past.  *See Williams*, 844 F.2d at 751.  If the

claimant is able to perform his previous work, he is not disabled.  20 C.F.R. § 404.1520(e)

(2006); *Williams*, 844 F.2d at 751.  This step requires a three phase analysis.

> In the first phase, the ALJ must evaluate a claimant's physical and mental [RFC],
> and in the second phase, he must determine the physical and mental demands of the
> claimant's past relevant work.  In the final phase, the ALJ determines whether the
> claimant has the ability to meet the job demands found in phase two despite the
> mental and/or physical limitations found in phase one.  At each of these phases, the
> ALJ must make specific findings.

*Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (citations omitted).  The fifth step

requires the Commissioner to demonstrate that the claimant has the RFC to perform other work

based on the claimant's age, education, past work experience, and evidence that such work exists

in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(f) (2006); *Williams*,

844 F.2d at 751.

**3.**      ***Disability Determination***

Plaintiff argues the ALJ erred in making her disability determination by: (1) relying upon

the VE's erroneous testimony that Plaintiff's past work consisted of work as a "parts clerk;" (2)

failing to support her RFC assessment with any rationale or reference to supporting evidence; (3)

failing to give controlling weight to the opinion of Dr. Holland; and (4) failing to develop the

record regarding Plaintiff's past work.  (Pl.'s Br. at 13–22.)  I need only address Plaintiff's third

argument.

It is well-established that an ALJ is required to give controlling weight to a treating

physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence

of record.  *See* 20 C.F.R. § 404.1527(d)(2) (2006); *Hamlin v. Barnhart*, 365 F.3d 1208, 1215

(10th Cir. 2004)*; Frey*, 816 F.2d at 513.  If the ALJ decides not to give a treating physician's

opinion controlling weight, the ALJ must consider a series of factors in determining the amount of

weight to give the opinion, including the degree to which the opinion is supported by relevant

evidence and the opinion's consistency with the record as a whole.  *See* 20 C.F.R.§

404.1527(d)(2)–(6) (2006); *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290

(10th Cir. 1995).  Should an ALJ choose to disregard the opinion of a treating physician, the ALJ

must set forth "specific, legitimate reasons" for doing so.  *Hamlin*, 365 F.3d at 1215.

In the instant case, the ALJ rejected two of Dr. Holland's opinions.[9]  First, the ALJ rejected Dr. Holland's opinion that Plaintiff could not sustain prolonged static positions due to worsening of pain with stationary positions, because the opinion lacked specificity.  (*See* Admin. R. at 18.)  Second, the ALJ rejected Dr. Holland's July 22, 2004 evaluation of Plaintiff's limitations, recited above, "because it appears to be simply a reiteration of Plaintiff's subjective complaints and his own stated capacity."  (*Id.*; *see Facts* § 1(a)(iii), *supra.*)

I find the ALJ failed to articulate specific and legitimate reasons for her rejection of Dr. Holland's opinion; thus her rejection of the doctor's opinion is not supported by substantial evidence.  *See Frey*, 816 F.2d at 515.  First, the ALJ's determination that Dr. Holland's restriction of Plaintiff from prolonged static positions lacked specificity is not supported by substantial evidence.  At the end of an exhaustive review of the history, symptoms, and treatment of Plaintiff's back condition, Dr. Holland diagnosed Plaintiff as follows:

> "lumbar spinal stenosis.  Severe limitation to range of motion in back with inability to perform repetitive movements.  Prolonged static position not possible due to his constant pain, escalated by stationary positions.  The clinical history of increasing pain with prolonged standing or walking is consistent with the findings on MRI of stenosis . . . ."

(*Id.* at 555–58.)  The only conceivably unspecific portion of Dr. Holland's diagnosis is the use of the word "prolonged" in lieu of a specific time period—for instance, thirty minutes.  (*See id.*)  However, this court can find no statute or case law that permits an ALJ to reject wholly a treating physician's opinion because she used a less specific, while still clearly defined, adjective

---

[9]The Commissioner does not dispute that Dr. Holland is one of Plaintiff's treating physicians.  (*See* Def.'s Resp. at 17–20.)

suggesting a time period, as opposed to a more specific delineation of the time period.  While use

of the term "prolonged" may allow the ALJ some leeway in determining the length of time the

word suggests, use of the term does not allow the ALJ the opportunity to dismiss the opinion

wholesale.  Accordingly, I find the ALJ's rejection of Dr. Holland's limitation on Plaintiff

sustaining prolonged static positions was not supported by a legitimate reason for doing so.  *See*

*Frey*, 816 F.2d at 515.

The Commissioner does not argue directly against this conclusion, but instead points out

the ALJ's statement that Dr. Holland's limitation was "largely consistent with the finding of the

[RFC] in this decision," implying that any error in rejecting the opinion was harmless.  (Admin. R.

at 18; *see* Def.'s Br. at 18.)  *See Glass v. Shalala*, 43 F.3d 1392, 1397 (10th Cir. 1994) (holding

harmless error where evidence issue would not have unfairly affected the ultimate result).  The

ALJ found in his RFC that Plaintiff could "stand, walk and sit for a total of six hours each [sic] in

an eight-hour day [and] must stand and stretch after sitting for one hour." (Admin. R. at 19.)

Although it may be argued this RFC allows Plaintiff to avoid prolonged sitting, it does not require

that Plaintiff avoid prolonged standing in one position, which is also a static position.[10]  Thus, the

RFC does not pay heed to Dr. Holland's limitation, and Defendant has failed to produce evidence

that such error was harmless.   *See Glass*, 43 F.3d at 1397.

Second, the ALJ's conclusion that Dr. Holland's July 22, 2004 assessment of Plaintiff's

occupational limitations was "simply a reiteration of [Plaintiff's] subjective complaints and his

---

[10]A position that is "static" is "characterized by lack of movement."  Mirriam & Webster, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986).

own stated capacity" is similarly unsupported by substantial evidence. (Admin. R. at 18.) Neither

the ALJ nor the Commissioner attempted to explain how they came to this conclusion. Dr.

Holland makes clear in his assessment that he viewed Plaintiff's complaints of "increasing pain

with prolonged standing or walking [to be] consistent with" objective medical evidence, in

particular the "findings on [Plaintiff's] MRI of stenosis." (*Id.* at 558.) Any speculative inference

by the ALJ to the contrary simply cannot constitute a specific and legitimate reason to support her

rejection of Dr. Holland's opinion. *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002)

("In choosing to reject the treating physician's assessment, an ALJ may not make speculative

inferences from medical reports.") (internal quotations omitted). Additionally, the record before

this court bears evidence that if Dr. Holland did base his opinion, in part, on subjective complaints

of Plaintiff, it was because—after treating Plaintiff for more than a year—he had come to believe

Plaintiff's complaints. As the doctor explains: "[Plaintiff] has been under my care for one year.

There is no evidence for malingering in this patient." (*Id.* at 555.)

Finally, before speculating as to the basis for Dr. Holland's occupational assessment of

Plaintiff, the ALJ—at minimum—had a duty to seek additional clarification from Dr. Holland.

Social Security Regulations mandate that when the evidence before the ALJ is inadequate to

determine whether a plaintiff is disabled, the ALJ should recontact the appropriate medical source,

or—if that medical source cannot or will not provide the necessary findings—ask the plaintiff to

attend one or more consultative examinations at the expense of the Social Security

Administration. 20 C.F.R. § 404.1512(e), (f) (2006); *see, e.g.*, *McGoffin*, 288 F.3d at 1252

(finding ALJ had a statutory duty to obtain additional information before determining a treating

physician did not agree with the assessment he signed).  Based on the foregoing, I find the ALJ

failed to support his rejection of Dr. Holland's occupation assessment with specific and legitimate

reasons for doing so.  The Commissioner offers no arguments that counsel against this result.

(*See* Def.'s Resp.)

Because Dr.  Holland opined that Plaintiff's physical limitations were significantly  more

debilitating than recognized by the ALJ in her RFC, my conclusion that the ALJ improperly

rejected Dr.  Holland's opinions may well result in a reversal of the ALJ's disability determination.

Accordingly, I decline to address Plaintiff's other arguments, and remand this case for

proceedings consistent with this opinion.

**4.**      ***Conclusions***

Based on the foregoing it is therefore:

ORDERED that the Commissioner's decision is REVERSED and REMANDED for

proceedings consistent with this opinion.

Dated this 6th day of December, 2006.

                                                   BY THE COURT:

                                                   <u>s/ Edward W. Nottingham</u>
                                                   EDWARD W. NOTTINGHAM
                                                   United States District Judge.